On April 20, 1993, Leonard Whitsett filed a complaint in the Madison County Circuit Court, seeking workers' compensation benefits. Whitsett alleged that he suffered permanent total disability as a result of almost being electrocuted on August 15, 1992, while working on high voltage electric wires at Redstone Arsenal and that his injuries arose out of and in the course of his employment with BAMSI, Inc.
Following an ore tenus proceeding, the trial court entered a judgment which found, inter alia, that Whitsett had a 75% loss of earning capacity (75% permanent partial disability). The trial court awarded benefits accordingly.
Whitsett appeals, raising one issue: Whether the trial court erred by failing to find him permanently and totally disabled.
Whitsett's injuries occurred on August 15, 1992; therefore, this case comes under the new Alabama Workers' Compensation Act (new Act).[1]
The new Act provides that "[t]he decision of the [trial] court shall be based on a preponderance *Page 289 of the evidence as contained in the record of the hearing, except in cases involving injuries . . . from gradual deterioration or cumulative physical stress disorders, which shall be deemed compensable only upon a finding of clear andconvincing proof that those injuries arose out of and in thecourse of the employee's employment." § 25-5-81(c), Ala. Code 1975 (emphasis added).
The new Act further provides that, "[i]n reviewing the standard of proof set forth herein and other legal issues, review by the Court of Civil Appeals shall be without apresumption of correctness." § 25-5-81(e)(1) (emphasis added). This, essentially, does not change the existing law of Alabama. The standard of proof required is a legal issue, and our supreme court has consistently held that the trial court's conclusions of legal issues carry no presumption of correctness on appeal. Ex parte Cash 624 So.2d 576 (Ala. 1993); Moore v.McNider, 551 So.2d 1028 (Ala. 1989); Williams v. Nearen,540 So.2d 1371 (Ala. 1989); and League v. McDonald, 355 So.2d 695
(Ala. 1978).
The new Act also provides that "[i]n reviewing pure findings of fact, the finding of the circuit court shall not be reversed if that finding is supported by substantial evidence." §25-5-81(e)(2) (emphasis added). This is a major change in this court's standard of review of the trial court's findings of fact and its judgment based on those findings as set out in Exparte Eastwood Foods, Inc., 575 So.2d 91 (Ala. 1991), and Exparte Veazey, 637 So.2d 1348 (Ala. 1993). Heretofore, this court could look only to see if there was any legal evidence (scintilla) to support the trial court's findings, and, if so, whether any reasonable view of that evidence supported the trial court's judgment. Eastwood Foods; Veazey.
We must now determine what our new standard of review on appeal will be for cases that are governed by the "substantial evidence[2] rule" under the new Act. Because we have no definitive standard of review for cases arising under the new Act, we must develop one. To do this, we look to other sources for guidance.
Our supreme court has held that Minnesota's construction of its workers' compensation laws is a source of persuasive value and guidance in these situations. Eley v. Brunner-Lay SouthernCorp., 289 Ala. 120, 266 So.2d 276 (1972); Young v. MutualSavings Life Insurance Co., 541 So.2d 24 (Ala.Civ.App. 1989);Buchanan v. Pankey, 531 So.2d 1225 (Ala.Civ.App. 1988).
In 1983, the Minnesota Legislature amended that state's Workers' Compensation Act, Minn.Stat. § 176.001 et seq. (1992), making major revisions in the standard of appellate review of workers' compensation cases. In Minnesota, the initial hearing of a workers' compensation case is before a compensation judge (administrative law judge). The compensation judge's award or disallowance of compensation may be appealed to the workers' compensation court of appeals (WCCA).[3] Minn.Stat. § 176.421
(1992). One of the grounds for appellate review before the WCCA is that "the findings of fact and order were . . . unsupported by substantial evidence in view of the entire record . . . ." Minn.Stat. § 176.421 subd. 1(3) (1992).
The Minnesota Supreme Court then defined the WCCA's new standard of review of the compensation judge's findings and order as follows:
 "The standard of review — whether the findings and order are supported by substantial *Page 290 
evidence — means the findings are to be affirmed if, in the context of the record as a whole, they are supported by evidence that a reasonable mind might accept as adequate.
 "In applying this standard, the [WCCA] looks not only at the evidence which supports the compensation judge's findings, but also at the opposing evidence and the evidence from which conflicting inferences might be drawn. The evidence, in a sense, is weighed to determine its substantiality. This is what is meant by viewing 'the entire record as submitted.' "
Hengemuhle v. Long Prairie Jaycees, 358 N.W.2d 54, 59
(Minn. 1984) (citations omitted).
The WCCA may "substitute for the findings of fact made by the compensation judge [different] findings based on the total evidence"; it can "make or modify an award or disallowance of compensation . . . based on the facts, findings, and law. . . ." Minn.Stat. § 176.421 subd. 6(3) and (4) (1992). The WCCA weighs the evidence, and it can substitute its judgment for that of the compensation judge. Hengemuhle, supra.
A judgment, or other order, by the WCCA may then be reviewed by the Minnesota Supreme Court. One of the grounds for review by the Minnesota Supreme Court is that "the findings of fact and order were unsupported by substantial evidence in view of the entire record as submitted." Minn.Stat. § 176.471 subd. 1(3) (1992). The Minnesota Supreme Court framed its new standard of review of the decisions of the WCCA as follows: "The facts are viewed in the light most favorable to the findings of the WCCA. [The] WCCA decisions will be overturned only if 'it appears that the findings are manifestly contrary to the evidence or that it is clear reasonable minds would adopt a contrary conclusion.' " Johnson v. City of Plainview,431 N.W.2d 109, 112 (Minn. 1988) (quoting Hengemuhle, 358 N.W.2d at 61).
This court does not wish to weigh the evidence on appeal as the WCCA does; therefore, for guidance we elect to look to the standard of review applied by the Minnesota Supreme Court in its review of the decisions by the WCCA.
Therefore, we adopt the following standard of review of workers' compensation cases under the new Act: We will view the facts in the light most favorable to the findings of the trial court. The trial court's judgment will not be reversed unless it is clear that the trial court's findings are manifestly contrary to the evidence as contained in the record as a whole or unless it is clear that fair-minded persons in the exercise of impartial judgment would adopt a contrary conclusion.
We now address the merits of this appeal under our new standard of review.
Whitsett contends on appeal that "[t]he overwhelming evidence at trial indicated that [he] was permanently and totally disabled." BAMSI did not cross-appeal; it contends that there was substantial evidence to support the trial court's finding of a 75% permanent partial disability.
Consequently, we must affirm unless we determine that the trial court's finding of a 75% permanent partial disability was manifestly contrary to the evidence as a whole or that fair-minded persons in the exercise of impartial judgment would have adopted the conclusion that Whitsett suffered permanent total disability.
The parties stipulated that on August 15, 1992, the relationship of employer/employee existed between BAMSI and Whitsett, and that Whitsett was injured by an accident while performing the duties of his employment with BAMSI.
The record evidence reflects the following facts. Whitsett testified that he was disconnecting and grounding a powerline on Redstone Arsenal when there was a power back-feed out of a substation and he was hit with 4,160 volts of electricity. As a result of the electrical shock, he was blinded and had difficulty getting the bucket in which he was working down to ground level. He suffered burns to both hands, his chest, his face, and his left arm. His hair was burned, his clothes were almost burned off of his body, the lenses of his glasses were burned out of the frames, and he suffered severe burns in his genital area. He was taken to Huntsville *Page 291 
Hospital, but he testified that he did not remember much of the treatment he received, because he was in shock.
Whitsett also testified that, since the accident, he experiences double vision, he has problems sleeping, and his left hip gives out unexpectedly, causing him to fall. Whitsett also loses his hearing when he bends over to tie his shoes, he has problems with his balance, and he has extremely high blood pressure, Whitsett's medical records reveal that immediately after the accident his blood pressure was 200 over 120 and later had risen to 210 over 126. Whitsett has continuous tremors in his right hand and the skin on his face continues to crack and bleed. The record reflects that Whitsett had not had high blood pressure, problems with his hearing, or any other medical problems before the accident.
Whitsett has been unable to work since the accident and his only income has been workers' compensation benefits. He testified that he was 62 years old and that he had completed the eighth grade in school. Whitsett's only training was as an apprentice electrician with a utility contractor. Whitsett had been a high-voltage electrician since 1948 and he had never had a "desk job" in his life. Before working for BAMSI, Whitsett had worked in the construction field and for the Tennessee Valley Authority.
John Edward Heard, Whitsett's former stepson, testified that Whitsett had been married to his mother for 13 years before they divorced. Heard had maintained contact with Whitsett after the divorce and he had observed Whitsett's work habits before the accident. Heard testified that before the accident Whitsett would take him around and show him the home-improvement projects he was working on. Additionally, before the accident, Heard had never seen Whitsett with tremors or shakes and had never seen Whitsett take any kind of medicine. Heard also testified that before the accident Whitsett had never been seriously ill. Heard further testified that, since the accident, he had seen Whitsett shaking so much that he could not pick up a glass of water or a cup of coffee to take a drink; that Whitsett's right arm constantly shakes; and that Whitsett's skin is constantly blistered and red. Heard testified that Whitsett is a different person since the accident and that he just sits around and is not very active.
After Whitsett had gone through physical therapy, he was assigned to Dr. Jan Davis, a BAMSI doctor, and to a case nurse so that they could review his case and send him to the appropriate specialists.
Whitsett testified that Dr. Davis referred him to Dr. George C. Morgan, Jr., a neurologist. Dr. Morgan testified by deposition that he first saw Whitsett on September 26, 1992, and that he took a history from Whitsett, which revealed that Whitsett's blood pressure fluctuated; that he had a tremor; that he had difficulty with his balance that caused him to fall; and that he had double-vision on occasions. Dr. Morgan also took a blood pressure reading from Whitsett, which indicated that his blood pressure was elevated.
Dr. Morgan also testified that an MRI scan and a transcranial Doppler study were conducted of Whitsett's brain. He testified that the transcranial Doppler study looked for significant narrowing or occlusion of a blood vessel and that the Doppler test was negative. Additionally, the MRI did not reveal a cause for Whitsett's symptoms. Dr. Morgan found that Whitsett had mild hardening of the arteries but that the hardening of the arteries was not causing his problems.
Dr. Morgan next saw Whitsett on October 28, 1992, and Whitsett's blood pressure was again elevated. Dr. Morgan gave Whitsett a trial sample of Inderal to lower his blood pressure and to control his tremors.
Dr. Morgan testified that he had last seen Whitsett on April 19, 1993. On that date, Dr. Morgan asked Dr. Davis to again evaluate Whitsett's problems with his blood pressure, because over a six-month period there had been a gradual increase in his blood pressure in spite of medication. Whitsett's blood pressure was 160 over 100 in January 1993 and was 190 over 110 on April 19, 1993. Dr. Morgan testified that those blood pressure readings, particularly the 190 over 110 reading, were dangerous, because high blood pressure over long periods of time tends to *Page 292 
damage the blood vessels and kidneys and cause strokes.
Dr. Morgan testified that in his opinion, based on Whitsett's intermittent falling, double-vision, and constant tremor, Whitsett had probably suffered an injury to a number of nerve cells in his brainstem. Dr. Morgan also testified that "there is a very strong likelihood that [Whitsett's high blood pressure] could be related to his injury to his brainstem," and that in his opinion Whitsett's tremors were "a direct result of the electrical shock [and were] secondary to the injury to the brainstem based on the history and the clinical findings."
Dr. Morgan testified that he did not believe that Whitsett could return to work as an electrician, because of his tremor, and that "in [his] experience with similar injuries that chances are pretty nil [that Whitsett could be expected to return to the work-force]." Also, Dr. Morgan testified that Whitsett's limitations for any job would be severe because Whitsett needs a job with no stress, no manual dexterity, no walking, and using only his voice.
Dr. Davis testified by deposition that he first saw Whitsett on September 9, 1992. Dr. Davis examined Whitsett and found superficial burn scars of the nose, cheek, and right hand, and deeper burns with scarring of the left wrist and hand. Whitsett's blood pressure was 170 over 110. Dr. Davis's initial diagnosis was electrical burns and hypertension.
Dr. Davis was Whitsett's general physician from September 1992 through October 1993 and during that time he monitored Whitsett's high blood pressure and tried different medications and different doses of medication for treatment of Whitsett's high blood pressure. He testified that Whitsett's response to the medications had been poor. Dr. Davis testified that in his opinion Whitsett could not return to work as an electrician because of his tremors and his balance problems, but that he could perform light to moderate manual work.
Dr. John D. Turner, a cardiologist, testified by deposition that he saw Whitsett on June 29, 1993, on a referral from Dr. Davis. Dr. Turner took a medical history from Whitsett and examined him. Whitsett weighed 215 pounds and his blood pressure was 190 over 110 in the right arm and 185 over 110 in the left arm. Dr. Turner conducted a 12-lead electrocardiogram, which showed some nonspecific changes. Dr. Turner testified in his opinion Whitsett's chronic hypertension was probably unrelated to his electrical shock.
Dr. Rosanne L. Winn, a nephrologist, testified by deposition that she had seen Whitsett on July 21, 1993, and that he had been referred by Drs. Davis and Turner. Dr. Winn obtained a medical history from Whitsett and she examined him to evaluate him for hypertension. On examination of the retina, Dr. Winn found some arterial narrowing, and she observed a tremor in Whitsett's right hand and arm.
Dr. Winn next saw Whitsett on August 17, 1993. She testified that Whitsett's blood pressure medication had been changed by Dr. Davis and that the new medication was causing him to feel unwell so she changed his medication. When Dr. Winn last saw Whitsett on September 14, 1993, his blood pressure was in a good range but he told her he felt weak. Dr. Winn testified that she looked in medical literature for an association between the development of hypertension and an electrical shock but that she did not find anything.
Approximately two weeks before the February 7, 1994, trial date, BAMSI's workers' compensation carrier sent Whitsett to see Dr. Bradley Evans, a Birmingham neurologist. Whitsett testified that Dr. Evans took his blood pressure, asked him what floor they were on; asked him to touch his finger to his nose; and ran his finger up his leg and asked if he could feel it. Whitsett also testified that Dr. Evans spent about 15 minutes with him and that Dr. Evans did not run any kind of test on him.
Dr. Evans testified by deposition on February 3, 1994, that he first saw Whitsett on January 24, 1994, and that he took a medical and a social history from him. Dr. Evans examined Whitsett and the examination took approximately 30 minutes. *Page 293 
Based on his short examination of Whitsett, Dr. Evans testified that Whitsett had mild to moderate memory deficits, a hearing loss in his right ear, and a tremor of his right upper extremity. On a sensory examination, Whitsett had decreased light touch sensation over his right foot and that his gait was abnormal. Dr. Evans testified that it was his impression that Whitsett had multiple neurologic problems: episodic double-vision, memory deficit, a tremor, loss of hearing, and a right Babinski toe, all of which were unrelated to his electrical shock. Dr. Evans found no evidence that Whitsett had an injury to his brainstem.
Dr. Evans admitted on cross-examination that he did not run any kind of tests on Whitsett or take any X-rays. Dr. Evans testified, however, that Dr. Morgan was wrong in relating Whitsett's problems to the electrical shock and a brainstem injury. Dr. Evans also admitted on cross-examination that Whitsett is unemployable and "that an employer would not hire him, based on just looking at him." Dr. Evans testified that he did not know what was causing Whitsett's high blood pressure.
Patsy V. Bramlett, a certified vocational counselor, testified that she had interviewed and tested Whitsett, and that she had reviewed Whitsett's medical records from Dr. Morgan, Dr. Davis, and the Huntsville Hospital emergency room. Bramlett also had access to Dr. Morgan's deposition testimony and to Whitsett's medical records from Dr. James A. Flatt.
Bramlett testified that Dr. Morgan determined that Whitsett would not be able to do any kind of electrical work, because of his tremor and balance problems. Bramlett determined that Whitsett did not have any transferable job skills that would fit within his restrictions. Bramlett testified that, in her opinion, Whitsett is unable to return to his usual employment, because of his limitations and the residual problems from his injury. Bramlett also testified that she could not identify or find any jobs that Whitsett could physically perform with his limitations and that in her opinion Whitsett is totally and permanently disabled.
BAMSI's vocational expert, Jane Ann Jackson, a certified rehabilitation counselor and licensed professional counselor, testified that she interviewed Whitsett; that they went through his medical history; that they talked about the treatment he had received; and that they talked about the limitations he had as a result of the accident. Jackson also testified that they went through the doctor's records, Whitsett's educational background, and his vocational history; and that Whitsett was given the Wide Range Achievement test. Jackson had Whitsett's medical records from Drs. Turner, Winn, and Davis and she had reviewed Dr. Evans's deposition testimony.
Jackson testified that Whitsett had worked mainly as an electrician. Jackson also testified that Whitsett had a 51% loss of access to jobs in the Madison County area and that he had a 39% loss of access to wages. Jackson averaged the 51% loss of access to jobs with the 39% loss of access to wages, for an overall vocational loss of 45%. Jackson testified that Whitsett could be employed as a deliverer of merchandise, a security guard, a parking lot attendant, or could do janitor-type work. Jackson also testified that Whitsett could pump gas, operate a cash register, and do hand packaging. On cross-examination, however, Jackson admitted that Whitsett had a 99% loss of access to jobs in the job market. Jackson testified that there were 50 parking lot attendant jobs in the Huntsville area but that there were no such jobs available.
The trial court's findings of fact placed great emphasis on Dr. Evans's testimony from a 15-30 minute office visit two weeks before the trial, as opposed to the testimony of Dr. Morgan, Whitsett's treating physician. Dr. Morgan testified that, based on Whitsett's history and his findings and test results, he thought Whitsett's tremors, hypertension, and balance problems were related to his injury on August 15, 1992. The only rebuttal of Dr. Morgan's testimony came from Dr. Evans.
Bramlett, a certified vocational counselor, testified that in her opinion Whitsett is totally and permanently disabled. Jackson, a certified rehabilitation counselor for BAMSI, testified on cross-examination that Whitsett *Page 294 
has a 99% loss of access to jobs in the job market.
Our appellate courts have consistently held that "permanent total disability" does not mean absolute helplessness or entire physical disability, but, instead, means the inability to perform one's trade or to obtain reasonably gainful employment.Wright v. Goodyear Tire Rubber Co., 591 So.2d 518
(Ala.Civ.App. 1991); W.Y. Shugart Son, Inc. v. Cox, 578 So.2d 1332
(Ala.Civ.App. 1990). We hold that this well-established principle of law was not changed by the new Act.
Also, our supreme court has held:
 " 'The Workmen's Compensation Act should be given a liberal construction to accomplish its beneficent purposes, and . . . all reasonable doubts must be resolved in favor of the employee.' American Tennis Courts, Inc. v. Hinton, 378 So.2d 235, 237 (Ala.Civ.App. 1979), cert. denied, 378 So.2d 239 (Ala. 1979).
 " '[A]n employee covered under the workmen's compensation law is entitled to be fully compensated for a job-related injury and . . . the provisions of that law should be liberally construed to accomplish just such a result.'
 "Haggard v. Uniroyal, Inc., 423 So.2d 865, 866
(Ala.Civ.App. 1982)."
Ex parte Hagan, 607 So.2d 219, 221 (Ala. 1992). The Alabama Workers' Compensation Act is to be construed liberally so as to effect its beneficent purposes. Moore v. Reeves, 589 So.2d 173
(Ala. 1991).
BAMSI does not dispute that Whitsett suffers at least a 75% permanent partial disability; however, the question in this case is whether, in viewing the facts in the light most favorable to the findings of the trial court, it is clear that the trial court's findings are manifestly contrary to the evidence as contained in the record as a whole or whether it is clear that fair-minded persons in the exercise of impartial judgment would adopt a conclusion that Whitsett is permanently totally disabled.
After carefully reviewing the record, we find that Whitsett proved by a preponderance of the evidence that he suffered permanent total disability as a result of his work-related injury. Consequently, we hold that the trial court's findings are manifestly contrary to the evidence as contained in the record as a whole and that Whitsett is permanently totally disabled for workers' compensation purposes.
The judgment of the trial court is reversed and this cause is remanded for the entry of a judgment consistent with this opinion.
REVERSED AND REMANDED WITH INSTRUCTIONS.
THIGPEN and YATES, JJ., concur.
[1] In 1992, the Alabama Legislature revised the Alabama Workmen's Compensation Act (old Act), creating the new Act. Ala. Acts 1992, Act No. 92537. While the new Act became effective May 19, 1992, some of the provisions of the new Act were specifically implemented as of August 1, 1992. Two of the changes in the new Act that were put into effect on August 1, 1992, related to the burden of proof required before the trial court, § 25-5-81(c), and the standard of review to be applied by this Court, §25-5-81(e).
[2] Substantial evidence has been defined differently by our legislature and our supreme court. See § 12-21-12(d), Ala. Code 1975; § 6-5-542(5); Sears, Roebuck and Co. v. Harris,630 So.2d 1018 (Ala. 1993); West v. Founders Life Assur. Co. of Florida,547 So.2d 870 (Ala. 1989). Substantial evidence is something less than a preponderance of the evidence or thesubstantial weight of the evidence. § 25-5-81(c), Ala. Code 1975; Ex parte Morris, 263 Ala. 664, 83 So.2d 717 (1955); Cityof Dothan Personnel Bd. v. Herring, 612 So.2d 1231
(Ala.Civ.App. 1992); Williams v. Mobile County Personnel Bd.,607 So.2d 268 (Ala.Civ.App. 1992); and Freman v. City of Mobile,590 So.2d 331 (Ala.Civ.App. 1991).
[3] The WCCA consists of five judges appointed by the Governor of Minnesota, by and with the consent of the Minnesota Senate, who each serve a six-year term of office and review only workers' compensation cases. Minn.Stat. § 175A.01 subds. 1, 2, and 5 (1992).