THIGPEN, Judge.
In November 1993, Dorothy Staggs filed a complaint seeking workers’ compensation benefits by alleging that she had injured her left knee, in December 1992, while working within the line and scope of her employment with Golden Poultry Company, Inc. (Golden). She further alleged that she had suffered a permanent total disability as a result of this job-related accident. Golden answered, admitting that Staggs had suffered an injury while acting in the line and scope of her employment, but contending that a dispute existed as to the degree of her injury and the resulting disability.
Following ore tenus proceedings, the trial court found that Staggs had suffered a 60% loss of earning capacity as a result of her permanent partial disability, and that she was temporarily totally disabled from February 1993 until January 1994. Golden’s post-judgment motion was denied; hence, this appeal.
Golden raises two issues on appeal: (1) whether the trial court erred in finding that Staggs was totally disabled from February 1993 through January 1994, and (2) whether the trial court erred in finding that Staggs had suffered a 60% loss of earning capacity.
*1350 At the time of the trial, Staggs was 59 years old, had a ninth-grade education, had a work history of performing only manual labor jobs, and had been declared totally and permanently disabled by the Social Security Administration. To perform her job as a liver puller, Staggs stood on a raised platform approximately six hours per day and pulled livers from approximately 45 chickens per minute. She testified that she was injured in December 1992, when she twisted her knee and fell as she stepped down from the raised platform, and that she reported the injury to her supervisor, Emma Thompson, who sent her to the nurses’ station. She testified that an ice pack was applied to her knee, and that she subsequently attempted to return to performing her job. Staggs testified that the following day, she returned to the nurses’ station because her leg was swollen, and that several days later, she sought treatment from Dr. David Khoo, an orthopedic surgeon approved by Golden.
In January 1993, Dr. Khoo performed arthroscopic surgery on Staggs’s knee, and in February 1993, he released her to return to work. Staggs testified that she returned to work and attempted to resume her regular duties; however, on her first day back at work, her leg was swollen and hurting after approximately three hours. Staggs testified that for that day, she was assigned other duties where she was allowed to sit while performing a job. One of Golden’s nurses examined Staggs’s leg when she returned to work and noted that Staggs was favoring her left leg, and that the knee appeared to be “off-centered.” Staggs further testified that, although she finished her shift, she was not able to return to work the next day, and that several days later, Golden terminated her employment.
Staggs testified that within a few days after her attempted return to work, she told Jan Smith, a nurse at Golden, who apparently handled the workers’ compensation claims, that she needed another doctor’s appointment. She further testified that in May 1993, her attorney requested a list of approved workers’ compensation doctors, but that Golden did not provide the list until August 1993, and that Golden did not schedule her doctor’s appointment until October 1993. Staggs stated that her initial delay in seeking additional medical treatment when her condition did not improve was based upon her lack of financial means, and because she erroneously believed that she no longer had workers’ compensation coverage because of her employment termination. She returned to Dr. Khoo’s office in July 1993.
Dr. Gilbert R. Melson, II, an orthopedic surgeon, first saw Staggs in October 1993; he stated that, although Staggs’s medical history regarding the leg revealed that her treatment had included arthroscopic surgery, an arthroscopic abrasion chondroplasty, and a lateral meniscectomy on her knee, kneecap, and thighbone, she had continued to have pain. Dr. Melson testified that Dr. Khoo’s medical notes indicated a diagnosis of an internal knee derangement and a torn knee cartilage; however, his own examination indicated that she had chondromalacia of the knee, which is a condition that causes cartilage to become torn, chipped, and ragged. Dr. Melson testified that this condition led to the grinding or grading of the surfaces between the kneecap and the thighbone portion of the knee joint, and that it was his opinion that Staggs’s present condition was caused by the accident or injury she suffered on the job. He testified that on subsequent doctor’s visits, Staggs continued to have swelling, aching, and pain in her knee, and that “she still had a tendency for some slight drift of the knee when she bore weight.” He further testified that when he last saw Staggs in May 1994, her condition was essentially unchanged, that his prognosis was that additional arthritic conditions would develop, and that her condition would gradually worsen and require further surgical procedures, specifically, arthroplasty or total knee replacement. Dr. Melson testified that Staggs had a 20% impairment to the lower extremity, resulting in an 8% impairment to the body as a whole, and that Staggs had reached maximum medical improvement before March 1994. He placed permanent restrictions on Staggs’s activities, including the amount of time she could sit or stand, the amount she could lift, carry, push, or pull, no squatting, bending, or crawling, and limited climbing and reaching.
*1351 Dr. David Khoo, Staggs’s initial treating physician, diagnosed her condition in July 1993 as chondromalacia, i.e., a deteriorating kneecap. He testified that she might develop arthritis, and that chondromalacia never completely heals. He further testified that medical conditions such as Staggs’s tend to worsen with time. He restricted her to light-duty work, which was one step above sedentary level.
Emma Thompson, Staggs’s supervisor at Golden, testified that Staggs was a good employee, that Staggs had made no complaints about her health before her injury, and that when Staggs returned to work after her surgery, she was unable to perform her regular job duties. Thompson testified that Staggs appeared to be in pain, that her knee was swollen, and that she was unable to drive herself home. Thompson testified that she told her supervisor that Staggs was unable to stand and perform her regular job, and Thompson further testified that she knew Staggs had called in and reported that she was unable to come to work because of her knee condition. Thompson testified that she heard from a fellow supervisor that Staggs’s employment had been terminated for failure to report and for failure to call in that she could not come to work.
Thomas Elliott, a vocational rehabilitation expert, initially assigned Staggs a vocational impairment rating between 60% and 65%, and a vocational impairment rating of 39% based on a different scenario. He further testified that Staggs was totally and permanently disabled under the Social Security Administration regulations, and that because of her age, skills, and restrictions, her prognosis for returning to any gainful employment was extremely poor. Elliott testified that he formulated his opinions after interviewing Staggs, administering tests to her, reviewing her medical history and reports, and considering her education and work history, her functional capacities evaluations, and other background information.
Charles Waldrop, a vocational rehabilitation counselor, testified that Staggs could still perform light-work jobs. He assigned her a 23% overall disability rating, and after he considered the same factors that Elliott considered, he assigned a 57% rating. Wal-drop testified that he had not personally interviewed Staggs, that he had not tested her, and that he had not met her. He further testified that there was a possibility that Staggs was totally disabled from any employment.
This ease is governed by the new Workers’ Compensation Act which promulgated a new standard of review. In reviewing pure findings of fact, under the new Act, the trial court’s findings will not be reversed if they are supported by substantial evidence. Ala. Code 1975, § 25-5-81(e)(2). In Whitsett v. BAMSI, Inc., 652 So.2d 287, 290 (Ala.Civ.App.1994), this court adopted the following new standard of review:
‘We will view the facts in the light most favorable to the findings of the trial court. The trial court’s judgment will not be reversed unless it is clear that the trial court’s findings are manifestly contrary to the evidence as contained in the record as a whole or unless it is clear that fair-minded persons in the exercise of impartial judgment would adopt a contrary conclusion.”
This court has further determined that “[t]he new Act did not alter the rule that this court does not weigh the evidence before the trial court.” Edwards v. Jesse Stutts, Inc., 655 So.2d 1012, 1014 (Ala.Civ.App.1995).
Golden first argues that no evidence supports the trial court’s finding that Staggs was totally disabled from February 22, 1993, through January 1, 1994. Our Supreme Court has stated:
“Temporary total disability refers to ‘the healing period during which an employee is recovering and unable to work.’ [Citation omitted.] ‘It has repeatedly been held that the “time of temporary disability” is the recovery period that lasts until maximum medical recovery is reached.’ [Citation omitted.] Temporary total disability is ordinarily established by direct evidence of actual wage loss.”
Ex parte Moncrief, 627 So.2d 385, 387-88 (Ala.1993).
The trial court found that Staggs’s employment was terminated a few days after she returned to work, despite the fact that she or her daughter had informed Golden *1352 that she was unable to come to work because of complications directly associated with her job-related injury. The testimony of Staggs’s current treating physician clearly indicated that his examination revealed that she was still suffering and experiencing complications from her initial injury as late as March 1994. He further testified that Staggs had not reached maximum medical improvement until early 1994. This testimony, coupled with other record evidence, as previously noted, amply supports the trial court’s finding that, from February 1993 until January 1994, Staggs was still in a healing period and unable to work. The trial court’s findings are not manifestly contrary to the evidence.
Golden next argues that the evidence does not support the trial court’s finding of a 60% loss of earning capacity. Both parties had vocational experts testify regarding Staggs’s vocational impairment. These experts presented ratings ranging from 23% to 65%, and the trial court noted that the rating assigned by Golden’s expert changed based upon various hypothetical situations.
Where the testimony conflicts, the trial court’s findings are conclusive, if supported by the evidence. Acustar, Inc. v. Staples, 598 So.2d 943 (Ala.Civ.App.1992). Also, when a trial court receives conflicting testimony, it, not this court, has a duty to resolve the conflict. Jones v. LeFlore, 421 So.2d 1287 (Ala.Civ.App.1982). Furthermore, the trial court is not bound by expert opinions; instead, to arrive at its judgment, “the trial court may consider all the evidence before it, as well as its own observations of the witnesses. The trial court may then interpret what it has heard and observed, according to its own best judgment.” Gibson v. Southern Stone Co., 518 So.2d 730, 731 (Ala.Civ.App.1987). Additionally, the assignment of the extent of disability is within the trial court’s discretion and cannot be disturbed on appeal if there is evidence to support that decision. Genpak Corp. v. Gibson, 534 So.2d 312 (Ala.Civ.App.1988).
Our review of the record reveals that the testimony of witnesses, including that of a vocational expert, Staggs’s treating physician, and others, along with Staggs’s own subjective complaints of pain, provides sufficient support for the trial court’s judgment. Furthermore, the trial court was free to choose which evidence, or expert, it believed. Seifert v. Houlditch, 583 So.2d 274 (Ala.Civ.App. 1991).
The record contains substantial evidence supporting the trial court’s findings, and that court’s judgment is not manifestly contrary to the evidence. Accordingly, the judgment is due to be, and it is hereby, affirmed.
AFFIRMED.
ROBERTSON, P.J., and YATES, MONROE, and CRAWLEY, JJ., concur.